Good afternoon, ladies and gentlemen, Judges Bumate and Beatty and I welcome you to the Ninth Circuit. We have one matter on this afternoon, Michael Stephen Combs v. Ron Broomfield, case number 19-99010. It is a capital case, meaning that each side has 30 minutes total. If you are the petitioner, appellant, and you wish to reserve some time, it's up to you to keep track of your time, but I'm looking right at the clock, so if you tell me aspirationally how much time you would like to save, I'll try to remind you. Seven minutes, Your Honor. All right. Thank you. You may proceed. May it please the Court, Pamela Gomez on behalf of Michael Combs, appellant, whose capital jury did not know that his mother had been repeatedly raped by her own father, and because of that rape, thought that Michael was the product of the last time her father had raped her, which caused her to try to self-abort, thus damaging Michael while still in utero. I would like to start by dispelling the notion that trial counsel actually obtained the records concerning Michael Combs' adoptions at the time in foster care. The Attorney General cites to Trial Exhibit 65 at Volume 4, page 800 of a police supplemental excerpt of records. Those are not Michael Combs' adoption records, let alone a complete set of his foster care records. What they are, it's actually an unofficial record of the adoption decree, most likely obtained from Combs' adoptive parents themselves, since the document contains letters addressed to the Combs. It is not a complete record of Michael's foster care records. In fact, it's only four pages of that document referred to foster care, but it actually is a duplicate, so it's only two pages of that document. So I'm not quite understanding what the relevance of that would be. Well, the Attorney General's argument seems to be that that document shows that trial counsel actually had conducted a complete investigation, which is not the case, Your  Counsel waited until one week before the trial, before voir dire commence to seek a subpoena ducis tecum to get the birth records of Michael, knowing from the... Why is that relevant? Didn't they know who his mother was? But they didn't do the proper diligent research to actually find her, let alone... Yeah, that's a separate question, but the fact of these records, you know, whether or not the adoption records were complete, they knew who his mother was, and so how is that relevant? Because, Your Honor, that's actually a red flag for them to actually conduct a proper investigation from the beginning that they actually took the case. Before they were actually appointed to the case, Michael had been examined by another expert, and in trial counsel's files, there was a record where that expert said, and I quote, I think he used actually the word, tantalizing. It would be tantalizing to try to find out Michael's biological family, given what he has seen, and that in his experience, it compels us to find out and to look for the biological parents. Well, I think you argue that defense counsel did not begin looking for Combs' mother until November 1992, when they filed the ex parte application to subpoena for Combs' birth records. How do we know defense counsel had not started its investigation sooner? I'm not saying that they didn't start to look for her. What I'm saying is that they did not conduct a complete investigation that would have led to not just finding the mother, but also finding other relatives who could have given the same type of red flags that the mother herself had indicated. Well, so wasn't the, okay, I'm just trying to figure out what your best case to support your argument that defense counsel rendered deficient performance by starting its search for Combs' mother too late. So the evidence, it seems to me that what the best would be that she would be able to have said that she drank while she was pregnant. Correct, Your Honor, among other things. And that she had tried to ingest drugs to induce the abortion, and that led to damage while Michael was in utero. Well, there was evidence in the trial that he had organic brain damage, and I, in going over all of the voluminous record, that I think that more than one of the doctors pointed that he had some lesions in his brain to show that he had, and it was opined that one of them could have been, one of the reasons could have been fetal alcohol syndrome. They didn't actually say fetal alcohol syndrome. What they said is that the damage could have been done while at birth. But as we know, Your Honor, it's a different thing to actually speculate as actually to present that evidence for the jury to determine that. Wasn't his mother's, weren't her statements inconsistent about her alcohol consumption? So she said a couple of different things, which suggested very different amounts of alcohol being consumed while pregnant. Right, either a six pack or a 12 pack in a week or two weeks. But the problem with fetal alcohol syndrome, Your Honor, is not necessarily the amount, but it's actually the time at which it was ingested. And Michael himself actually phenotypically shows the marks of fetal alcohol syndrome in his face, as our doctor in post-conviction noted. So I'm thinking about the prejudice prong of Strickland. So the investigators identified Mr. Crumb's birth mother and tracked her to where they believe she lived in Wisconsin, and then lost track of her. There was some vague evidence that she went to Texas. A neighbor said they thought she moved to Texas, and they didn't find her after that. And even when she was located years later, she said she wasn't sure she even had a driver's license there, or a job, or any way that they could have found her. So I guess that goes to the sufficiency of the investigation. One, did they do enough? And two, given the inconsistencies in her statements and the voluminous, the vast amount of psychiatric and medical evidence that was presented, would it have made a difference? So Your Honor, as to the prejudice prong, just as in Rompela, the Supreme Court said that his problem might have, that his problem started during childhood, and most likely caused by his fetal alcohol syndrome. That was the case here, unbeknownst to his capital jury. And it's not that trial counsel completely failed to follow the leads that he had. It's just that they didn't do a complete investigation in a timely fashion. Just as in Willingham. Well, I guess you still, I want to tell you, because I think at some point I need to have an answer on this, that the facts in this case are very disturbing, which is not atypical of capital cases. I mean, obviously capital cases, you know, are the higher level of murder cases, you know, and factually. But they're particularly egregious and cold, and I just wonder what, let's assume he had fetal alcohol syndrome, how that could have changed the result of the facts in this case. And the ones that I'm just going to tell you that the jury heard, that I think are very troubling, and sometimes you see murders where people kill a lot of people, or I've done a lot of capital cases, been around a long time, and, but this, they murder this woman, they decide they need a car and they need money. And then they had someone else in mind, that person counseled, so then they pick someone that she works at the martial arts place that your client works at. So he knows her. So then, she doesn't even have a very good car. It's not like, she's not wearing Hermes and Gucci and all of that. There's no indication she's got a lot of money. But anyway, they want money and they want a car because your client is facing some forgery charges and he's decided he needs to get out of town. So then when you look to the facts of the actual murder, that it's not, and, you know, I don't know that there's any good way to be murdered if you're the victim of the murder, but it doesn't happen quickly. It's a strangulation, then they have to tie, she's fighting, and they have to tie her, they have to tie her wrist, so it goes on for a while. Then there's hitting her with a flashlight, and then there's rocks in a jacket, and then finally they check when she expels a bowel movement, they decide she's finally dead. Then they just dump her body unceremoniously, and then the jurors heard other testimony. Your client confessed, and then there's that reenactment, which is a really kind of unusual component in a case, and he very calmly reenacts the whole thing, showing how, that he committed this in the actual car, nine days after this has all happened. He confesses, he confesses to it, and then there's testimony that the jury hears how he got a three-day high of actually doing the killing, and she has no money. She doesn't, she has a junkie car, and she has no money, and when he asks about, you know, are you sorry about it, well, I'm sorry, it would have been worth it if she'd had some money, but she doesn't even have any money. So they're really very harsh facts for your client to overcome, and I'm just wondering how fetal alcohol syndrome is going to do that. Your Honor, that actually explained Michael's failure to show any particular remorse in his reenactment. That goes to the core of the matter. He is biologically unable to express remorse, you know, in his expression, because of the fetal alcohol syndrome. But not everyone that has fetal alcohol does this kind of crime. And Your Honor, if I may, although I'm not minimizing what happened here, I would just point the court to William C. Taylor, wherein William C. Taylor, not only did he kill the defendant with a mattock, but after doing that, he went ahead and killed, I'm sorry, and violently attacked two elderly women, two elderly people, one of whom was left in a vegetative state, and had more other aggravation, including starting a fire in jail while pending trial. Nonetheless, the Supreme Court found prejudice under D-2, because it was unreasonable for the state court not to weigh both the mitigation and aggravation in total, and figure out whether that, in the eyes of the jury, reduced his moral culpability. That's what extremely— Is the failure to show or express remorse an aggravating factor? I mean, and the other— That's what the DA argued, Your Honor, at the time of trial. Well, they didn't really argue that. I mean, their argument focused on the brutality of the crime. It didn't seem that the showpiece of the state's case was he didn't show remorse. They had two confessions, one of which was recorded reenactment, and a very brutal crime. And that seemed to be the emphasis of their case. And then the aggravating factors were his priors, that it was done for money, but not that he didn't show remorse. Right, Your Honor— So you're saying, as a general matter, you think the jurors may have been prejudiced against him because they didn't think he was showing remorse for this— I mean, we have evidence that they did. And the attorney general herself emphasizes his cold reaction and his cold demeanor in post-conviction. And that was the argument that was made. So how do you have evidence of the jurors' deliberations that doesn't violate Rule 606? But, Your Honor, what we have learned after the fact—and that takes us to one of the other uncertified claims that we have about one of the jurors not disclosing that she herself had been in a psychiatric facility. Well, that's different, because that would be extraneous to the information that was presented at trial. Correct, Your Honor. But what the jurors talked about in their deliberations and this issue of whether he showed remorse, that would seem to be sort of classically barred, that you cannot present that evidence. But to the extent that the State Court relied on the attorney general's argument emphasizing his lack of remorse, that is what makes the decision unreasonable. Not necessarily that the jurors may have noticed, but it is what the attorney general argued in their briefs in post-conviction and what the attorney general argued below, that it was his lack of remorse that showed how cold-blooded of a killer he was. Where, in fact, it was just a syndrome pilla where the Supreme Court found that his fetal alcohol syndrome reduced his moral culpability, here, too, the fetal alcohol syndrome reduces his moral culpability, not just in the fact that he can't show remorse, but also explains the adjudications, the juvenile adjudications that were used against him as aggravators, including the fact that he tried to commit suicide four times while in custody, which is a maladjusted response, even his fetal alcohol syndrome, to the stress he was under. Counsel, couldn't the fetal alcohol syndrome cut the other way, though, that it makes him more dangerous, that he's got these, you know, mental problems that are from birth that make him dangerous and unstable? So wouldn't it cut the other way with the jury? And even if it did, Your Honor, the Supreme Court has found in Williams v. Taylor, also, that the mitigation presented, while it still did not reduce his future dangerousness, it still would have impacted the juror's decision. Well, couldn't it heighten the dangerousness? Just as in Williams v. Taylor, the Supreme Court found that the mitigation that he had presented did not reduce his future dangerousness, which is a requirement in Texas, that the mitigation itself still reduced his moral culpability. And we have the example, also, in Abdul v. Kabir, where the Supreme Court in 2007 said that the strength of Cole's mitigation evidence was not its potential to contest its immediate dangerousness, to which ant experts' testimony was at least as harmful as it was helpful. Instead, its strength was its tendency to prove that his violent propensities were caused by factors beyond his control, namely neurological damage, which is exactly what we have here,  And then my other question is, what exactly should have counsel done when the investigators went to Wisconsin, couldn't find the mother, and I think they just had some vague information that she moved to Texas? What exactly should have happened at that point? Your Honor, that is not the sole argument that we're having. What we're saying is that counsel should have looked for the biological relatives and his foster care records from the moment they took the case. Well, but to prevail on your strickling claim regarding the search for the mother, you do have to show that competent counsel would have tracked her down before the penalty. Correct. And I'm about to explain why. As early as November 1991, two years before they sought the subpoena justicium, they knew that Combs was adopted. Not only that, but they knew that an expert had urged them to look for the biological relatives because it would be tantalizing to know who they had and because he bet that they had criminal tendencies as well. And that's at ER 1817. You still haven't connected it to me. You're saying if they started earlier, they maybe would have found her? Yes, Your Honor. That's it? I mean, they would have exhaust the avenues to actually look for her. But they did exhaust. They did not, Your Honor. Okay. So then that's why you have to explain when they went to a place that thought she lived, she wasn't there, and they heard that she moved to Texas. What should have they done then? What is important to remember is that they did that. So the attorney general points to what she calls an undated memo, right? But the undated memo actually refers when they actually tried to seek the subpoena justicium, which was one week before Ruadier begins. Justice Williams, that invest— I guess my problem is I thought that your argument was that they're ineffective because they failed to find the mother. They failed to promptly— No, it's the timing. It's both the timing and the quality of the investigation. So let's just focus on the quality then. What more should have been done? Exactly what we have done. Just follow that lead, Your Honor. But that was 2005 and 2006. So how did the habeas investigator track her down? There were other search mechanisms available at that time, right? By precisely looking at the lead that prior counsel had obtained and following up from there. And that's why we would prove at a evidentiary hearing, which was never granted in this case, although trial counsel has passed away, we have trial counsel's records, and we will be able to establish the chain of custody and the integrity of those counsel's files to actually show at a proper evidentiary hearing what counsel had before them, the timing of that evidence, and what they failed to do. I mean, when we— Is there any evidence in the record why he stopped the investigation at that point, trial counsel? The investigator doesn't know, Your Honor. But you have the records. There's nothing—  What the investigator says is that we don't know why we stopped the investigation. It might have been because we ran out of time, or the attorneys told us to stop. And that's the declaration that we have. Okay. There's nothing more. Correct. And, Your Honor, it only took—we were appointed in 2006. Less than seven months later, we obtained Combs-Foster correctness. And that was without a subpoena power or anything of that matter. And the importance of those records is of the plethora of other red flags that they indicate, and that is at Volume 8, ER 2145-55. Among others, the foster care worker notes that the mother seemed to be of low-average intelligence and had difficulty expressing herself comprehensively. She was lacking in emotion, affect, and at times, her emotional responses seemed inappropriately directed. She kept the baby for six weeks and then decided she did not have the proper emotional feeling for it. The birth mother was the fourth child in a family of six children, meaning there were other people trial counsel could have found had they looked that could have also testified how the mother had been repeatedly raped, including the mother's younger sibling, who remembers precisely the same incident where she came back from the dunes with her dress torn on and her knees scraped after the father had raped her. She expressed negative feelings toward her father at 16. Her mother was out and her father tried to get into her bed. The child appeared— All of this, while tragic and incredibly disturbing, doesn't seem to be something that would have affected Mr. Combs because he was entirely unaware of it. The crimes against the mother are another matter. What you're leading all that up to is her attempts to induce an abortion and then her consumption of alcohol, which is a medical, psychological issue. We have Dr. Cronella, Dr. Graves, Dr. Poore, Dr. Oshren, and then the four additional doctors at Habeas. So, like, a very, very significant investigation with imaging, review of medical records, evaluations by all these doctors. I mean, a very comprehensive review of Mr. Combs' mental and physical state. But, Your Honor, just as in Rompilla, where it's not the amount of the investigation, it's the quality of the investigation, right? In Rompilla— Well, many of these are experts that the defense put forward.  In Rompilla, counsel introduced a testimony of three experts. We have eight here that I've just rattled off. There may have been more. Right, but because they had not the complete information about Rompilla, they weren't able to accurately opine about this. Didn't they—didn't some of them say there may have been fetal alcohol syndrome, or there's another term for it that—I can't remember what it is—there's an additional letter in there. Fetal alcohol spectrum disorder, I think is what it is. That's actually in post-conviction, Your Honor. At the time of trial, the experts only speculated that the organic brain damage may have been in utero, but there was no evidence to the case. And as we know— I mean, I know you disagree with this, but it seems that they had enough that they testified and were suggesting that there were these problems, but it seems to me you're looking for sort of the cherry on the top, like here's another diagnosis that they could speculate about because they didn't—they wouldn't have any information that that had actually occurred. No, Your Honor, but I mean, just like as in Rompilla, his fetal alcohol syndrome was not under speculation, and it's still the court found it meaningful to explain what had happened at that time. Here there is no difference. Counsel had the opportunity to do a complete investigation. Because of inattention, just as in Wiggins, they failed to actually follow the leads in a timely fashion that they did. Just as in Wiggins, when counsel asked the day before the sentencing to bifurcate the proceedings, here counsel asked a week before Wadir for a subpoena to search for the medical records of his birth. That's just—it's just—the similarity is actually very interesting to note that a Supreme Court case which found the prejudice and deficient performance also found the timeliness of the investigation proper. We—Williams v. Taylor also instruct us that it's important to find out when the timing of the investigation, as well as the standard of care at the time of the trial. Counsel had a duty to conduct a complete, adequate, constitutional investigation before trial began, and we've cited that—those cases in our briefs. You want to save the balance of your time? Yes, Your Honor. All right. Thank you.  May it please the Court, Deputy Attorney General Sharon Rhodes, appearing on behalf of Respondent Appellee. Combs has failed to show that the California Supreme Court's denial of his penalty-phase ineffective assistance of counsel claims involved an unreasonable application of United States Supreme Court precedent. He has not met his burden of showing that no fair-minded jurist could have reached the conclusions the California Supreme Court reached in rejecting his claims. Since your friend on the other side spent so much time on the locating of Combs' mother, maybe we can kind of start there, since I know they're not abandoning other arguments, but that seems to be a focal point. And Combs argues that defense counsel did not begin looking for Combs' mother until November of 1992, when they filed the ex parte application for the subpoena of Combs' birth records. Do you dispute that that is when defense counsel began the investigation, if not what evidence is in their record of otherwise? Yes, we do. The reason is the undated memo does not state when they started looking. But what the investigator did say in his undated memo was that when he got the results of the subpoena back, it merely confirmed what he already knew, which would indicate that he'd already been investigating before he requested the documents. Unfortunately, we don't have either a declaration from the investigator since he's passed away, and his wife's declaration does not indicate when they started their investigation. So the defense investigator's memo indicates that Combs' mother was issued a Wisconsin license in late 1990, and Combs' mother's declaration states that she did not move from Wisconsin to Texas until 1993. So if defense counsel had started their search sooner, wouldn't they have found Combs' mother in the trailer park in Wisconsin? We don't know that. The information that we have is that they did, were able to, they first searched in California and they were able to track her to Wisconsin by looking at driver's license records. But we don't know the exact time when she actually moved to Texas. We don't have that information. Maybe you can tell me, do you dispute that Combs' mother would have provided mitigation evidence helpful to Combs? She would have provided mitigating evidence, but it would not have changed the result based on the... Okay, so you don't dispute that it would be mitigating, but you're saying on the prejudice prong? Correct, but it also, some of the things that were stated in her declaration, she disputed in her deposition in 2011, particularly she pointed out that she never took drugs to try to abort her fetus. And she said she told the investigator at the time she was filling, was showing her declaration that that wasn't right, and she understood they were supposed to take that out. But they had her sign it. So she has a declaration and a deposition, and they're factually not exactly in line. Should the Supreme Court have had a hearing on that? It wouldn't have been necessary, because based on the information that's in both the declaration and in the deposition, it wouldn't have shown that there would have been any difference based on the aggravating circumstances and the wealth of the mitigating circumstances that already were presented. The problem was not with the investigation, but the fact that what the experts both at Habeas painted a picture of him was refuted by his own actions that the jury was able to listen to in that recorded conversation and his own statements to the detectives and the experts, which this court has talked about already. And so his mental deficits that they were talking about were belied by his own actions and his own statements. He didn't testify either in, actually testify at the guilt or the penalty phase, right? That's correct. But so what the jury would have seen was they heard his, I think they saw the confession or whatever, and then they saw the reenactment. So that would have been, and then they saw him sit there for however long the trial took place. Yes. And then they heard from doctors that had, a number of doctors. Right. And also a number of jailhouse doctors and psychologists who also talked about how he was trying to play them against each other and how he was faking having a mental problem. He was trying to get help with his case and things of that nature. He actually did tell one nurse while he was in jail that one of his suicide attempts wasn't really because he was trying to kill himself, but because he was trying to get a better outcome in his case. Well, so, I mean, essentially, you know, obviously the, whatever the defense did didn't work because he got the death penalty. But my understanding of the approach in the guilt phase was not that he wasn't guilty of the killing. They were going for second degree. And if they went for second degree, then you have to get first degree in order to get to the specials and move on to the penalty phase. And so that failed, right? Yes. And they did call, so they have the reenactment, they have his confession, they, and is it Cronella testified at that particular juncture of, that he was not capable of forming some sort of intent, right? Right. I mean, he did not say he actually did inform the intent, but he talked about his mental deficits and things to try to convince the jury that it wasn't a premeditated murder. Although he had to admit on cross-examination that he could have done it. That kind of went badly. Yeah. So, a lot of the, I guess when I'm looking at it, basically his whole defense had to be, in the guilt phase, his whole defense was his mental, his, a mental state that would take him down to second degree murder. When he went to the penalty phase, his whole defense would be, I have had a horrible life and there were a lot of doctors that testified as to, to try to outweigh the very bad facts in this case. Yes. And his record, I guess, as well.  Yeah, because he, he'd also had two prior adjudications as a teenager when he robbed two women at knife point. So his, this murder, which was for money, also was not an aberration because he'd had conduct beforehand. So the experts, I think that there's some criticism by the defense that somehow, I don't know, Oshkren somehow came out because Cronella had relied on Oshkren's report. So I'm trying to figure out, if you have nothing but you have to do the mental defense here, and obviously they have to put that in, is, are they asking us to thread the needle a little too, it's too thin in terms of that all of these doctors had good things to say, arguably for the benefit of him, but then there were other things like he had antisocial personality and other things came out. And I think, was it Oshkren's report that said that he was high for three days after the homicide? No, he actually told Dr. Cronella that. Oh, he told that to Cronella. Yes. Yeah. That didn't come out in the guilt phase, did it? I don't believe so. It came out in the penalty phase? I believe so, but yeah, that was told to Dr. Cronella, yeah. How was it kept out in the guilt phase? You know, to be honest, Your Honor, I'm not quite sure when it came out, but I do know that it was with Dr. Cronella's testimony. I'm surprised that Cronella got to testify so narrowly in the guilt phase. He was, I think he was careful not to try to, he said at one point, well, I can't tell you exactly what his intent was, but I can tell you what his mental problems were. And so he was trying to be, in that case, not say exactly what his intent was, but saying based on his mental condition, he couldn't form these, you know, the premeditation, etc. But basically what happened with Dr. Oshwin's coming out is that in Mr. Cronella's past, he had actually had treating physicians or psychologists who actually, I think one time in 1986, he voluntarily went into a psychiatric facility, and during that treatment, there were officials at that facility who thought he had antisocial personality disorder, but they didn't actually reach that diagnosis because they could not come to an agreement. So that information would have been in the treatment records. And of course, since he's putting his mental state at issue, the prosecution would have been entitled to all his treatment records. So there wouldn't be a way, if that's the court's question, to keep out antisocial personality disorder from either the prosecution or the jury because it's part of his treatment history. And the experts that the defense decided to use would have wanted to review all his prior examinations and evaluations in order to come to a correct diagnosis. And they also mentioned portions of Dr. Oshwin's report in their testimony that they agreed with. So as the court stated, yes, there was good things and some bad things. And... The defense gave Dr. Oshwin's report to the testifying experts, right? Yes. Yes. And one of the experts... But you're saying it still would have come out anyway because once the defendant put his mental state at issue, the prosecution would have been entitled to see these reports anyway? Well, Dr. Oshwin originally was hired as an expert. But what I'm saying is that the antisocial personality disorder history of diagnosis was in treatment records. So that would have come out because having put his mental state at issue, that would have come out. The reason Dr. Oshwin's report came out, the DA did not even know about it until Cronella testified and mentioned portions of the report that he thought were significant and that he agreed with. And so at that point, during a recess between direct and cross-examination, defense counsel provided the report because, as the Supreme Court noted on direct appeal, presumably because he had to, because the prosecution was entitled to see... So what reason did defense counsel have to give Dr. Oshwin's report to the testifying experts, which opened the door essentially for the prosecution obtaining the report and calling Dr. Oshwin as a witness? Well, we don't know specifically because both counsel are deceased, so we don't have any information from them specifically regarding what their decision was on that. They could have wanted the experts to be able to have a full history of Mr. Combs in making their evaluation. Perhaps the experts wanted to see all of them. But there was...Dr. Oshwin's report wasn't the only report that the experts looked at that were other health, mental health professionals that had come to the same diagnosis. Question. So you agree that the mother's testimony would have been mitigating, but what would have the fact that he was a product of incest done to the evidence? How would that enhance it in some way? Well, he actually wasn't a product of incest. She just thought that. Oh, okay. That's not... That's still disputed. Okay. But assuming that that's true, in what way would that enhance the evidence? I don't see how that would enhance the evidence. In mitigation somehow? There's no issue or there's no information that Mr. Combs somehow inherited some type of mental disorder. It's all based on the fetal alcohol syndrome is what the claim is. Right. Okay. So the alcohol part is the stronger part? Yes. And I believe there was a record that actually that there was a DNA test done and her father is not Mr. Combs' father. So there was never any incest. Oh, I'm sorry. There was DNA testing proving he was not the product of incest? Yes. Oh, I don't... Okay. So arguably, the fact that even if she was repeatedly raped by her father, I think Judge Beatty made the point, well, but Mr. Combs, how would... What would he know about that? How would that mitigate his situation? Right. There's no evidence that he even knew who his birth mother was. So he was adopted at 18 months and as the record shows, his adoptive mother was a very loving mother and treated him well and so he had no information about his prior life before that. He was too young to remember any of that anyway. One of the things I just wanted to clarify from what the appellate counsel was arguing is the argument of the prosecutor at trial was not that the way Mr. Combs was acting at trial or his flat effect showed he had no remorse, but he was arguing his statements to the detectives showed he had no remorse. So I just wanted to make that clarification. Say that again? He... So the prosecutor was arguing at trial that there was no remorse shown based on Mr. Combs' own statements to detectives, that he didn't have any remorse. He admitted that to the detective and said the only thing he was sorry about was that she didn't have the money and he admitted that he and his girlfriend laughed about the murder afterwards. So it wasn't a flat effect or lack of emotion presented before the jurors or the detectives. I'm remembering that part of the testimony now. He said if she'd had $5,000 or $10,000, he regretted it because she didn't have more money. That's correct. Right. And he told the officer that they laughed about it, he and is it Purcell? Yes. Yeah. Now she got LWOP, right?  Did she... She, I know, was in a separate proceeding. Did she actually go to trial? I believe she did, yes. Okay. So I was concerned about the discrepancies in the birth mother's statements about alcohol consumption. So her declaration says 12 cans per week and then her deposition testimony, she said maybe six cans every two weeks. Was there any testimony from the habeas experts about if that's a significant difference? I don't recall that. Also I want to point out, I think one thing that's important about the search for the birth mother is that when the search was happening, it was an unstable time in Mrs. Miller's life. By the time she was found by habeas counsel, which she states was a prior habeas counsel in 2000 or 2001, which is what she said in the deposition, and when she was found by current habeas counsel in 2005, she'd been at the same location in Grants Pass, Oregon since 1994. And of course the trial concluded 1993. So the fact that habeas counsel was able to find her years later when she was leading a more stable lifestyle does not show that counsel could have been able to find her at a time when she, as she admitted in her deposition, she didn't have a job in Texas, she didn't have a driver's license, she was living in an apartment above her sister's house. So that's also differences between the two searches. There's an uncertified issue that seems fairly complicated with respect to the juror not disclosing in Vordaer that she had been in a psychiatric hospital. And because the California Supreme Court's denial of habeas is a summary denial, we have very little insight as to why they denied that claim and whether it was a reasonable denial. What is the state's response? I know you probably focused on the certified issues for briefing and argument, but because that argument is so complicated, it seems that maybe it should at least be certified. And I think there's a component of their argument that there should have been an evidentiary hearing about the juror's statements and her responses to the questions during Vordaer. I think that the, it's true that we don't have a reasoned opinion regarding the reasons for the California Supreme Court's denial of that claim, but the record doesn't show that the juror intentionally failed to disclose that or that the answer would have supported the challenge for cause. And this, basically what the questions in the questionnaire were, was did you consult a psychiatrist or a psychologist, or did you have psychology or testing of that nature? And of course we don't know what kind of questions the juror was asked by the investigator decades later to give her response, which was that in 1970 she had been hospitalized and found to be bipolar. And basically we don't know the circumstances of that. There's no indication that it's possible because that was not something that she wanted, that something that she would put about her mind because it was just an unpleasant experience or it was embarrassing. So there's not really evidence that she intentionally didn't disclose it. It's possible that the investigator prompted her memory by asking several questions, which we don't know what they were. What am I remembering about that the record didn't put in the actual juror's statement? It was hearsay that it was the habeas investigator's statement of what the juror said. What do I remember? Yes, that is correct. We don't have a declaration of the juror stating those responses. What we have is the declaration of the investigator saying this is what the juror told me. Do we know why we don't have that declaration? Is the juror deceased? Is there some other reason? We have no information as to why there was not a declaration of the juror. Well, could the California Supreme Court reasonably have not considered that as hearsay? Yes, the California Supreme Court, under their case law, has said repeatedly and even in instances for motions for a new trial that they don't require a further motion or hearing based on hearsay declarations because they're not going to upset or even require further investigation based on hearsay declarations. The case law that we cited in our brief showed instances of where there was counsel or an investigator actually saying what the juror said and the California Supreme Court said that's not sufficient and found that the trial court didn't err. And wasn't the questionnaire somewhat ambiguous in whether or not she did misrepresent that? Because it said, did she ever consult with a psychiatrist or psychologist? But if she was involuntarily held because of something, that doesn't seem like the same thing as consulting. At least she would not perceive it. It's a reasonable person to say that's not me consulting with someone that's someone examining me by force or involuntarily, but that's not me consulting. Yes, I would agree with that. Maybe as attorneys we can do a broad thing, but maybe as a lay person you would think, no, I never consulted somebody, I was put in there. Because the declaration of the investigator does say that she mentioned that it was a scary place and they were on her lock and key and she was in a cell with other people. So that doesn't sound like some voluntary commitment on her behalf. So yes, the question could easily not have, and the district court noted that in its order too, that it didn't show that the juror actually intentionally did not disclose. And actually the juror's other responses showed she would be a good defense juror. She indicated that she would be considering psychiatric evidence, that she answered no to questions that said, oh, a defendant can find anybody to say whatever they want. She disagreed with that strongly. During Bodire she told the defense counsel that she would definitely consider his past family history and any psychological problems that he had. So on balance, it didn't show that she was biased, and in fact she never told any of the jurors by the declarations that the habeas counsel has presented to the court. There's no declaration of any juror saying she discussed that information, which would indicate that she somehow was intentionally holding that back and was using that to be biased against Mr. Combs. You say on balance because the investigator's declaration also reports that she said from that experience she knew what crazy people looked like and Mr. Combs didn't appear crazy, which would suggest that she may have had some bias and that she was discounting any psychological or mental illness that could have been a mitigating factor to suggest life without parole rather than death. One of the things we also have to find out is if those statements are part of what her thoughts during deliberations, then those statements aren't admissible under either California Law 1150 or the federal rules over 606 because statements regarding deliberations aren't admissible to reverse a verdict. But jurors are allowed to rely on their experiences, and just because she had this experience doesn't mean that she actually was biased and jurors can use their life experiences in the jury room. And so that doesn't actually indicate that she would be biased against Mr. Combs. Unless the court has any further questions for the reasons discussed today and set forth in our briefs, we request that the court affirm the district court's denial of the first amended habeas petition and dismiss it as prejudice. Thank you. Do you have any additional questions? We don't have any additional questions. We're prepared to have additional questions. Thank you. Your Honor, if I may, you mentioned the evidence introduced at trial. However, the San Bernardino jury that heard the case actually deliberated for almost five days to reach their verdict, and all it takes is one juror to have doubt that Mr. Combs has served the death penalty. That's why the additional evidence developed in mitigation could have led to a different result. And it's not true that we're only basing our claim on the fact that they couldn't find the mother. That's just one of the issues. But the complete claim is that counsel did not conduct a proper investigation in a timely fashion as required by Strickland and its prodigy. A complete investigation would have revealed that Combs himself actually is biologically disposed to mental illness. His mother, his biological mother, is mentally ill. His sister, both his half-sisters are mentally ill. One of them, we have a declaration, actually started ingesting drugs as early as 18, sorry, as 11 years old. By the time of Michael's trial, his oldest sibling was already involved in the criminal justice system because of her mental illness, and that was the sister that the mother did not actually rear. She gave her up for adoption to her brother, and that both the brother and the sister-in-law were readily available to testify had trial counsel bothered to conduct that investigation. Counsel, can I ask one question? One of the prongs was that trial counsel did not investigate the mother until too late. It was too late? That they did not start looking for the mother.  We are not saying that they didn't look for her at all. We're just saying that they didn't do it. When should the trial, when would a reasonable counsel start that investigation? Your Honor, as soon as they got appointed. So what's the delta then? Pardon me? What's the difference that you're saying? Almost two years. Two years in time. Counsel was appointed in 1991, sorry, 1992. By then, Dr. Oshman's report was already available, telling them how important it was to figure out his biological makeup. And the fact that, Your Honor, you just mentioned that the Oshman report came into light, that again speaks highly of what was going on at the time of trial. Just as in Wiggins, the record of the actual proceedings underscores the unreasonableness of the investigation. Here, there was another instance where counsel didn't know what counsel himself should have known. At ER 2789, when they're cross-examining Dr. Kenyon, they didn't realize that Dr. Kenyon had himself been appointed as one of the competency experts for the defense before. And I quote, and it wasn't until today that you found that we didn't know you were appointed at that time frame, correct? So that reflects their inattention as opposed to any strategic decision that guided some of their acts. Your Honor asked about the co-defendant Purcell. She was actually granted parole by the California system. Dr. Adler himself talks about the significance of the fetal alcohol syndrome. That would have rejected or contest the notion that Mr. Combs had actually antisocial personality disorder, because that type of diagnosis has to be eliminated before one can argue he has actually antisocial personality disorder. As to the juror claim, as we cited in our briefs, even the Supreme Court has asked, has demanded an evidential hearing of some sort based upon declarations. And, Your Honors, all declarations are hearsay, right, because they're out-of-court statements. Well, the problem really is that it's double hearsay. So you have the investigator reporting what the juror said. Correct. And in some of the cases that we cite in our briefs, that's actually the same instance, because the Supreme Court itself recognizes that it's very unlikely that jurors themselves would be able to actually sign those declarations, attesting that they may have misinterpreted what they provided in voir dire. And that was the case here. And presumably, if we had an evidential hearing with subpoena— Well, it seems, as a matter of California law, they would have been able to say they don't accept that double hearsay. But, Your Honor, there are exceptions. We all know there are exceptions to hearsay statements. And this would have probably qualified— Well, but how are we looking at what the California Supreme Court did? Whether or not it was unreasonable to deny further factual development based on the allegations that were originally available.  And if it shows that you didn't— That would have been, Your Honor, and the state just retried actually somebody else based upon a hearsay allegation when the statements were actually inculpatory at the time that they were made. So it would have been admissible, assuming that the juror is actually still alive, and with subpoena power, we would actually compel her to testify. And if she did not testify at that point, what she told the investigator would be able to come in. But at the time you were presenting this to the California Supreme Court, did the defense argue for a hearsay exception or provide an explanation? Your Honor, some of the cases that the warden actually cites in her briefs— It seems like you could say yes or no on that. Yes, Your Honor, we could. Yes. All that California requires are reasonable, available evidence. To ask for an exception to the double hearsay? We didn't even get to that stage of litigation, Your Honor. The court never even bothered to order an order to show cause. It was just an informal decision. The state objected that the declaration contained hearsay. Right. So my question was very specific. Did the defense respond? Did they offer an argument that there was a hearsay exception that applied or provide an explanation for the lack of at least a declaration? I would have to check what was argued below, and we'll figure that out. But what I can say is that the Supreme Court cases, as well as the California cases, have conducted and proved as to the impartiality of a juror based on similar evidence, based on similar statements that the jurors have made to other folks, including Bremel and Parker v. Smith. So it's not uncommon for claims of this type to rely on what jurors may have told others or what others may have heard. They can do what they want, but maybe no one objected. Maybe no one objected, and here there was an objection, and I'm not hearing that there was any response. But what I'm saying is that the objection is improper because we don't have subpoena power to compel the juror to provide testimony. So how could we compel the juror to say something or to sign something that the juror may or may not want to sign? And all that California requires are reasonable, available, and that's under Duvalby people. All that California requires are reasonable, available documentation. Okay, you've gone into overtime. Unless my colleagues have any additional questions, that will conclude your argument. Thank you. All right, thank you both for your argument. This matter will stand submitted. All rise. This court for this session stands adjourned.
judges: CALLAHAN, BADE, BUMATAY